In re MAIN STREET BREWING
CO., LTD., Debtor.

In re MARBA CORPORATION, Debtor.

Bankruptcy Nos. 96–45244–
JFQ, 97–41075–JFQ.

United States Bankruptcy Court,
D. Massachusetts.

July 3, 1997.

Henry E. Geberth, Jr., Hendel, Collins & Newton, P.C., Springfield, MA, for Main Street Brewing Co., Ltd.

Frank D. Kirby, Woburn, MA, for Marba Corp.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Like the phoenix rising from its own ashes, Main Street Brewing Co., Ltd. ("Main Street") seeks to reopen its business and obtain confirmation of a plan of reorganization. It does so after having had its case converted from chapter 11 to chapter 7 and then back to chapter 11. The wings of reorganization are aided by an updraft from two competing plans. One is proposed by Main Street and its affiliates, and the other by Moonpenny LLC ("Moonpenny") and its affiliate. Moonpenny is the holder of debt secured by real estate occupied by Main Street and owned by Main Street's affiliate, Marba Corporation ("Marba"), which is also a chapter 11 debtor here. Main Street and Marba are both obligors on Moonpenny's debt, whose security includes virtually all assets of Main Street.

On June 6, 1997, I held a hearing on the disclosure statements for both plans of each debtor. In the course of the hearing it became obvious that the rights of Martin A. Brody ("Brody"), who has filed proofs of claim in both cases, should be determined before the plans and disclosure statements

are completed. Questions were raised as to the amount of these claims and whether they are debt or in the nature of equity. The parties agreed that Brody's rights and two other matters [1] should be quickly adjudicated after an evidentiary hearing, without the necessity of further pleadings. Set forth here are my findings of fact and conclusions of law following that hearing, which took place on June 25, 1997.

## I. FACTS

Main Street and Marba (the "Debtors") were organized a few years ago by Howard L. Abrams and his son, Paul M. Abrams. Most of their stock was issued to Howard and Paul Abrams; a small percentage went to a group of investors. Marba, through a trust (Davos Realty Trust), took title to a five story empty building at 244 Main Street, Worcester, Massachusetts, which was formerly occupied by a furniture store.[2] It did so for the purpose of renovating the building so Main Street could operate a micro brewery and restaurant on the premises. Such so-called "brew pubs" have been successful elsewhere, in part because their beer is fresh and unpasteurized. This was to be the first of its kind in Worcester. The renovations required were substantial. By December 31, 1995, members of the Abrams family had invested over $1 million in the venture, in consideration of issuance of the Debtors' stock and notes. An additional $1 million, secured by the assets of both Debtors, was borrowed from a bank. This is the debt now held by Moonpenny.

Brody, who is married to a cousin of the wife of Howard Abrams, furnished another $200,000.[3] On August 25, 1995, Brody entered into identical stock warrant agreements with Main Street and Marba under which each acknowledged receiving $100,000 from Brody. Each Debtor gave Brody the right to receive a 20% stock interest in the Debtor, for no further consideration. Each Debtor agreed to use its best efforts to effect the occurrence of three events by November 1, 1995: (i) issuance of the required liquor licenses, (ii) closing on $1,000,000 in governmentally-guaranteed loans, (iii) approval of the stock issuance to Brody by the Commonwealth of Massachusetts and the United States Bureau of Alcohol, Tobacco and Firearms. If all three events occurred by November 1, 1995, Brody agreed to exercise his rights within ten days thereafter (the so-called "Exercise Period"). If the events did not occur by then, each agreement states: "[T]he Company will prior to expiration of the Exercise Period, purchase this Warrant from [Brody] for the purchase price of $200,-000 plus interest at the rate of 11% per annum from the date hereof through the date of purchase."

The parties thereafter agreed to two extensions of the date by which the three events had to occur, one to February 1, 1996 and the other to April 15, 1996. Although by then the liquor licenses had been approved and the $1,000,000 loan had taken place, the required governmental approvals for issuance of Brody's stock were never given.[4] On April 25, 1996, Brody, through his attorney, made formal demand upon each of the Debtors for payment of $200,000 plus interest from August 25, 1995. The Debtors, through their attorney, responded by offering to pay $200,000 (not $400,000), plus accrued interest. Brody declined.

Main Street opened for business on March 15, 1996. Its gross revenues were excellent from the start. But its operations were a disaster in their lack of efficiency. Although members of the Abrams family had substantial experience in the operation of hotels, and had hired a qualified brewmaster, they did not have the necessary skills to operate a micro brewery and restaurant. Expenses skyrocketed. On September 23, 1996, Main Street filed for protection under chapter 11. The case was converted to chapter 7 on January 31, 1997. Its business closed immediately. The case was converted back to

---

1. The other two matters, which are the subject of separate findings and conclusions, are: (i) valuation of the real estate, and (ii) Moonpenny's rights with respect to accrued rents.

2. The trust has since been dissolved and Marba is now the record owner of the property.

3. Brody also loaned Main Street $60,000 on January 4, 1996 in return for a promissory note payable on demand. Main Street does not object to this debt or request its subordination.

4. No reason for this was suggested at trial, nor was it demonstrated that such approval was required by any applicable statute or regulation.

chapter 11 after the Abrams family transferred their majority stock interest in both Main Street and Marba to Aiden Hughes and his associates. Marba filed its own chapter 11 petition on February 19, 1997. Brody has filed a proof of claim for $200,000, plus interest, in each case.

## II. *AMOUNT OF BRODY'S CLAIM*

The Debtors and Moonpenny first attack the amount of Brody's claims. They contend he has a claim for only $100,000, plus interest, in each case. This is so, they say, because the $200,000 purchase price appearing in each agreement was a scrivener's error. They maintain the intention of the parties was that Brody was to be repaid only his $100,000 investment in each Debtor, a total of $200,000, plus interest, and that this $200,000 aggregate price was mistakenly inserted in each agreement.

If in fact Brody and the Debtors made this mistake, it was a bilateral mistake sufficient to void both warrant agreements. *See Tewksbury v. Fellsway Laundry*, 319 Mass. 386, 65 N.E.2d 918 (1946); *Jeselsohn v. Park Trust Co.*, 241 Mass. 388, 135 N.E. 315 (1922); Restatement (Second) of Contracts, § 152. I am not, however, persuaded that a mistake was made. The same $200,000 amount appears in each of the two extension agreements Brody entered into with Main Street and Marba The evidence which was introduced to show a scrivener's error consisted only of the testimony of Paul Abrams. He conceded that his father and not he took part in the negotiations on Brody's warrants.

The Debtors argue, in the alternative, that their obligation to pay $400,000, plus interest, on a total investment of only $200,000, involves unenforceable usurious interest far beyond the stated interest rate of 11%. They point out that no required notice of the true interest rate was ever filed with the office of the Massachusetts Attorney General.[5]

■ The transaction between Brody and each of the Debtors was not a loan transaction. It consisted of two components: (i) the grant to Brody of the right and obligation to purchase a 20% stock interest if the three described events occurred by the agreed date, in consideration of the immediate payment of $100,000, and (ii) each Debtor's obligation to purchase the warrant for $200,000 plus interest if the events did not so occur. To treat this $200,000 obligation as simple debt for an advance of $100,000 ignores both the stock rights granted Brody and the wording contained in the warrant agreement itself, which describes the obligation as a purchase obligation. Thus there is no occasion to apply usury principles.

## III. *EQUITABLE SUBORDINATION*

Brody's claims for breach of the Debtors' agreements to purchase his warrant rights are similar to the claim of a former stockholder for payment of the balance due under an agreement whereby the corporation purchased his stock. The subject of both types of agreement is equity rights in the corporation. A stock redemption agreement pertains to stock already issued. The purchase agreements here involve rights to acquire stock not yet issued.

■ Payment by a corporation in redemption of its stock is a distribution on the stock. A corporation acquires nothing of value *to it* when it purchases its own stock. *See, e.g., Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 982 (1st Cir.1983); *Gold v. Lippman (In re Flying Mailmen Serv., Inc.)*, 539 F.2d 866, 870 (2d Cir.1976); *Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir.1935); *In re SPM Mfg. Corp.*, 163 B.R. 411, 413–14 (Bankr.D.Mass.1994). Its payment for the purchase is indistinguishable from a dividend in the lack of consideration received. *See Wangemann*, 75 F.2d at 757; *SPM Mfg.*, 163 B.R. at 413–14. That is why stock which a corporation purchases in redemption is carried on its books as a reduction from net worth rather than as an asset. *Consove*, 701 F.2d at 982. There is the same absence of consideration under the Debtors' agreements with Brody. The Debtors would acquire

---

**5.** A party charging interest in excess of 20% per annum is guilty of criminal usury unless he first notifies the Attorney General of his intent to engage in such loan transactions. Mass.Ann. Laws. ch. 271, § 49 (Law.Co-op.1992).

nothing of value *to them* should they purchase Brody's warrant rights.

If a corporation files for bankruptcy after purchasing its own stock on credit, courts treat the redemption debt as an obligation to make a distribution on stock. They subordinate to other creditors the claims of the former stockholders for the balance due under the stock redemption agreement. *See, e.g., In re Hawaii Corp.,* 694 F.2d 179 (9th Cir.1982); *Robinson v. Wangemann,* 75 F.2d 756 (5th Cir.1935); *Liebowitz v. Columbia Packing Co.,* 56 B.R. 222 (D.Mass.1985), *aff'd per curiam* 802 F.2d 439 (1st Cir.1986); *Ferrari v. Family Mut. Sav. Bank,* 186 B.R. 329 (Bankr.D.Mass.1995); *In re SPM Mfg. Corp.,* 163 B.R. 411 (Bankr.D.Mass.1994); *In re Dino & Artie's Automatic Transmission Co., Inc.,* 68 B.R. 264 (Bankr.S.D.N.Y.1986). As these courts see it, to give the redemption claim parity with the claims of other creditors is opposed to the priority which creditors enjoy over stockholders in bankruptcy. *E.g., Wangemann,* 75 F.2d at 757–58. They subordinate the redemption claims without regard to whether the corporation was solvent at the time of the redemption agreement or whether the agreement was valid under applicable corporate law.

Other courts take a different view. Some believe equitable subordination requires misconduct on the part of the claimant. *See In re Stern–Slegman–Prins Co.,* 86 B.R. 994, 1000 (Bankr.W.D.Mo.1988). Others examine state corporate law. If there is a statute which prohibits the corporation from paying for its own shares out of capital, these courts subordinate the redemption claim to other claims. *See, e.g., La Grand Steel Products Co. v. Goldberg (In re Poole, McGonigle & Dick, Inc.),* 796 F.2d 318 (9th Cir.1986), *opinion amended,* 804 F.2d 576 (9th Cir.1986) (statute prohibited purchase "or payment for" corporation's own shares when purchase "or payment" would make it insolvent); *Gold v. Lippman (In re Flying Mailmen Service,*

*Inc.),* 539 F.2d 866 (2d Cir.1976) (statute permitted purchase of own shares "except when currently the corporation is insolvent or would thereby be made insolvent"); *McConnell v. Butler's Estate,* 402 F.2d 362 (9th Cir.1968) (statute permitted "payment" to extent of current earned surplus); *In re Trimble Co.,* 339 F.2d 838 (3d Cir.1964), *appeal after remand,* 479 F.2d 103 (3d Cir.1973) (statute unspecific on time purchase is measured against surplus; court construed it to apply to time of payment). *See also Mountain State Steel Foundries, Inc. v. C.I.R.,* 284 F.2d 737 (4th Cir.1960) (statute permitted corporation to "use its funds" for purchase of own shares when this would not cause impairment of capital; court held interest deductions permissible so long as capital not impaired).

In *SPM Mfg.,* 163 B.R. 411 (Bankr. D.Mass.1994), after a review of the decisions, I joined those courts that subordinate stock redemption claims in bankruptcy under principles of equitable subordination. I did so despite the corporation's solvency at the time of the redemption agreement and despite the likely validity of the transaction under Massachusetts corporate law. I concluded that to give stock redemption debt parity with other claims would violate the priority enjoyed in bankruptcy by debt over stock. And I demonstrated that equitable subordination of such claims is called for by both the wording and legislative history of 510(c) of the Code.[6]

▌Essentially the same reasoning applies here. Brody's claim to be paid the sales price for his right to become a stockholder can rise no higher than a stockholder's claim to be paid for the purchase of his stock already issued. Both are claims for a distribution on stock rights. Because of this, both claimants must take a back seat to other creditors in bankruptcy. Although I find both the Debtors to have been insolvent on August 25, 1995, when the agreements were

---

6. Section 510(c) provides:
   (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
      (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part

of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
      (2) order that any lien securing such a subordinated claim be transferred to the estate.
   11 U.S.C. § 510(c) (1994).

made, that insolvency is not the basis for subordination. These claims are subordinated because of the Debtors' present insolvency.

Brody relies upon decisions dealing with whether funds which stockholders place in a business reflect a contribution of capital or debt. *See, e.g., Bauer v. C.I.R.,* 748 F.2d 1365 (9th Cir.1984); *In re Interstate Cigar Co.,* 182 B.R. 675 (Bankr.E.D.N.Y.1995). These decisions are not on point. There is no question that Brody holds claims rather than an equity interests. His equity interests expired at the end of the required period for the exercise of these warrants. The Debtors are in breach of their obligation to purchase these equity interests prior to the expiration of the warrant exercise period. These claims, however, must be equitably subordinated.

Brody contends there can be no equitable subordination of a claim absent inequitable conduct on the part of the claimant. He cites for this proposition *United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). But the Supreme Court said, in *Noland:* "[W]e need not decide today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." *Id.* at ——, 116 S.Ct. at 1528.

The Court's reasoning in *Noland,* moreover, supports rather than undermines equitable subordination of claims for the purchase of equity interests. The Court's holding was to deny equitable subordination of a claim filed by the Internal Revenue Service for penalties which accrued as a result of a chapter 11 debtor failing to pay its postpetition taxes. The Court so ruled because it believed subordination of such claims on a categorical level to be in conflict with sections of the Code providing for the priority of claims. *Id.* at ——, 116 S.Ct. at 1527. *See* § 503(b)(1)(C),

§ 507(a)(1) and § 726(a)(1).[7] The Court recognized that in setting forth the order of distribution in chapter 7, section 727 provides that its order of priority applies "[e]xcept as provided in section 510 of this title," and that section 510(c) authorizes subordination under "principles of equitable subordination." *Id.* at ——, 116 S.Ct. at 1527. But the Court observed there is no body of pre-Code case law equitably subordinating penalty claims. *Id.* at ——, ——, 116 S.Ct. at 1526, 1528. Although conceding that Congress wished to give courts some leeway to develop the doctrine of equitable subordination, the Court believed any such leeway did not include the ability to reorder the general priority scheme set forth in the Code. *Id.* at ——–——, 116 S.Ct. at 1527–28.

The considerations here are quite different. Subordination of Brody's claims conflicts with no general priority scheme. Indeed, the opposite is true. Brody's claims are subordinated because they are for a distribution on stock rights, so to give them parity with other debt runs counter to the priority of debt over equity in bankruptcy. And there is much pre-Code case law supporting the subordination of such claims.

A separate order has issued allowing and subordinating the Brody claims. The order permits the plans of reorganization of Main Street and Marba to: (i) pay nothing on the Brody claims if the plans impair general unsecured claims, or (ii) separately classify the Brody claims and give them a smaller dividend than the dividend given general unsecured claims, whether or not the general unsecured claims are impaired.

### COURT'S FINDINGS AND CONCLUSIONS ON REAL ESTATE VALUATION AND RIGHTS TO ACCRUED RENTS

On June 25, 1997, I held an evidentiary hearing on three matters: (i) the rights of

---

7. Congress provided for subordination of non-compensatory penalty claims, but only in chapter 7 and only for claims arising before the earlier of the order for relief or the appointment of a trustee. 11 U.S.C. § 726(a)(4) (1994). In *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* —— U.S. ——, ——–——, 116 S.Ct. 2106, 2114–15, 135 L.Ed.2d 506 (1996), relying upon

the reasoning employed in *Noland,* the Court held a chapter 11 plan cannot equitably subordinate a prepetition, noncompensatory penalty. Significantly, the Court declined to decide whether the plan could separately classify the penalty claim, and treat it differently, so as to reflect the lesser priority given it in chapter 7 by section 726(a)(4).

Martin A. Brody, (ii) valuation of the real estate at 244 Main Street, Worcester, Massachusetts, and (iii) the rights of the parties to accrued rents. I have today issued a separate opinion on the rights of Martin A. Brody. Set forth here are my findings of fact and conclusions of law on the other two matters.

I find that the real estate at 244 Main Street, Worcester, Massachusetts, including all fixtures, has a present fair market value of $1,200,000. This is the principal collateral held by Moonpenny LLC as security for the debt of slightly under $1,200,000 owed it jointly by the Debtors. Moonpenny has an additional security interest in personal property owned by the Debtors, but this property is apparently insignificant and was not the subject at the valuation hearing.

■ Marba Corporation has apparently accumulated some funds which represent rents paid it by Main Street Brewing Co., Ltd. Moonpenny contends that these funds, consisting as they do of its cash collateral, should be paid over to it. Moonpenny does not give any particular reason for the turnover, such as lack of adequate protection. Its argument is that the turnover is required simply because the funds consist of cash collateral. The plan proposed by Marba Corporation does not, however, even seek to impair Moonpenny's claim under section 1124 of the Code. The plan proposes a cure of past defaults, deacceleration of the debt and future payments in accordance with the loan documents. Marba Corporation will continue to own the real estate. These accrued rents, like the real estate, are merely collateral. Moonpenny has no more right to the accrued rents under such a plan than it has to a conveyance of the real estate.