In re STRUCTURLITE PLASTICS
CORPORATION, Debtor.

SPC PLASTICS CORPORATION and Official Unsecured Creditors' Committee of SPC Plastics Corporation, Plaintiffs–Appellees,

v.

Robert E. GRIFFITH, Charles D. Jones, Helen E. Griffith, Geraldine W. Jones, E. Clark Morrow, John W. Alford, Robert E. Griffith, II, Charles D. Jones, Jr., Larry Cox, William Jones, GLL Industries of Ohio, Inc., George L. Levy, Laurence M. Luke, GL Industries, Inc., Defendants–Appellants.

BAP Nos. 97–8096, and 97–8114.

United States Bankruptcy Appellate Panel of the Sixth Circuit.

Argued May 6, 1998.

Decided Aug. 25, 1998.

28

James R. Cooper, Morrow, Gordon & Byrd, Newark, OH, argued and on brief, for Appellants.

John E. Hoffman, Jr., Arter & Hadden, Columbus, OH, argued and on brief, for Appellees.

Before: BAXTER, LUNDIN, and STOSBERG, Bankruptcy Appellate Panel Judges.

## OPINION

The bankruptcy court granted summary judgment to the Plaintiffs/Appellees in these fraudulent conveyance and equitable subordination actions against the former shareholders in a failed leveraged buyout. We affirm in part, reverse in part, and remand for resolution of disputed facts with respect to the Debtor's insolvency.

### I. ISSUES ON APPEAL

A. Whether the Plaintiffs have standing to assert fraudulent conveyance claims against the former shareholders of the Debtor;

B. Whether the Debtor received fair consideration in the leveraged buyout;

C. Whether the leveraged buyout rendered the Debtor insolvent;

D. Whether the "good faith transferee" defense in 11 U.S.C. § 550(b)(1) is available to the former shareholders; and

E. Whether it is appropriate to equitably subordinate the claims of the former shareholders.

## II. JURISDICTION AND STANDARD OF REVIEW

The bankruptcy court's order granting summary judgment is final and appealable under 28 U.S.C. § 158(a)(1). *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 98 (6th Cir. BAP 1997).

A grant of summary judgment is reviewed de novo. *Myers v. IRS (In re Myers)*, 216 B.R. 402, 403 (6th Cir. BAP 1998); *Klingshirn v. United States (In re Klingshirn)*, 209 B.R. 698, 699 (6th Cir. BAP 1997), *aff'd*, 147 F.3d 526 (6th Cir.1998) (per curiam). Questions of standing also are reviewed de novo. *Ohio Ass'n of Independent Schools v. Goff*, 92 F.3d 419, 421 (6th Cir.1996) (citing *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 715 (6th Cir.1995)), *cert. denied*, —— U.S. ——, 117 S.Ct. 1107, 137 L.Ed.2d 309 (1997). "De novo means that the appellate court determines the law independently of the trial court's determination." *Myers*, 216 B.R. at 403 (quoting *Corzin v. Fordu (In re Fordu)*, 209 B.R. 854, 857 (6th Cir. BAP 1997)).

## III. FACTS

Structurlite Plastics Corporation manufactured fiberglass reinforced products for the automotive and other industries from facilities in Hebron, Lebanon and Newark, Ohio. Since incorporation in 1948, Robert Griffith and Charles Jones (the "former shareholders") each owned 49% of the Debtor.[1] On June 6, 1986, the former shareholders sold their interests to GLL Industries of Ohio, Inc. ("GLL"), a company formed to acquire the stock in the Debtor in a leveraged buyout ("LBO"). GLL is owned by George L. Levy ("Levy") and Laurence M. Luke ("Luke").

The purchase price for the stock was $4 million. To consummate the sale, the Debtor borrowed $1 million from Central Trust Company (the "Bank"), secured by a mortgage on the Debtor's Hebron facility. The Debtor loaned those funds to GLL, which used the proceeds to pay the former shareholders $840,000.[2] The Debtor's loan to GLL was unsecured. The remainder of the purchase price was evidenced by a promissory note from GLL to the former shareholders. This note was collateralized by a pledge of the Debtor's stock and guaranteed by the Debtor. Luke and Levy gave limited guarantees of GLL's note to the former shareholders. Luke's and Levy's initial investment in GLL was $1,000.

The Bank made two other loans to the Debtor in connection with the LBO. The first was a $500,000 equipment loan, most of which was used to pay off an existing loan. The equipment loan was secured by the Debtor's equipment and machinery. The second was a $750,000 revolving line of credit, secured by the Debtor's accounts receivable. The Bank's loans were cross collateralized.

On March 8, 1988, less than two years after the LBO, the Debtor filed Chapter 11. On June 5, 1990, the Debtor and the Creditors' Committee (the "Plaintiffs") commenced this action to recover the $840,000 payment to the former shareholders as a fraudulent transfer under Ohio Revised Code Annotated § 1336.04 (Anderson 1979 & Supp.1986) (repealed 1990).[3] The Plaintiffs sought also to avoid the Debtor's guarantee of GLL's $3 million promissory note and to subordinate any claims of the former shareholders. The bankruptcy court granted the Plaintiffs' motions for summary judgment. The former shareholders appealed.

## IV. DISCUSSION

### A. Summary Judgment.

Summary judgment in adversary proceedings is governed by Bankruptcy Rule 7056,

---

1. A third shareholder, E. Clark Morrow, owned the remaining two percent. Morrow settled with the Plaintiffs and is not party to this appeal.

2. Approximately $17,000 was paid to Morrow and the remainder, approximately $140,000, was paid to a broker.

3. In 1990, Ohio repealed its version of the Uniform Fraudulent Conveyance Act ("UFCA"), and enacted a version of the Uniform Fraudulent Transfer Act. The transactions in this case are governed by the old statute.

which incorporates Rule 56 of the Federal Rules of Civil Procedure. FED. R. BANKR. P. 7056.

> A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under this test, the moving part may discharge its burden by "pointing out to the [bankruptcy] court ... that there is an absence of evidence to support the nonmoving party's case." The nonmoving party cannot rest on its pleadings, but must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial. Although we must draw all inferences in favor of the nonmoving party, it must present significant and probative evidence in support of its complaint. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."

*Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 198 (6th Cir. BAP 1998) (quoting *Hall v. Tollett,* 128 F.3d 418, 421–22 (6th Cir.1997) (internal citations omitted)).

"A material fact is one whose resolution will affect the determination of the underlying action." *Id.* (citing *Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.,* 88 F.3d 1466, 1472 (6th Cir.1996)). An issue is genuine if a rational trier of fact could find in favor of either party on the issue. *See Schaffer v. A.O. Smith Harvestore Prods., Inc.,* 74 F.3d 722, 727 (6th Cir. 1996) (citation omitted).

## B. Fraudulent Conveyance.

### 1. The Plaintiffs have standing to bring a fraudulent conveyance action against the former shareholders under 11 U.S.C. § 544(b) and Ohio Revised Code § 1336.04.

█ Ohio Revised Code § 1336.04 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to *creditors* without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

OHIO REV.CODE ANN. § 1336.04 (Anderson 1979 & Supp.1986) (repealed 1990) (emphasis added). "Creditor" for purposes of this provision is "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." OHIO REV.CODE ANN. § 1336.01(C) (Anderson 1979 & Supp.1986) (repealed 1990).

The bankruptcy court observed that an action for constructive fraud under Ohio Revised Code § 1336.04 may be brought only by "a creditor which was owed both at the time of the transfer and at the time the action is brought, or, for purposes of a trustee's avoidance powers under section 544(b) of the Bankruptcy Code, when the petition is filed." *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 193 B.R. 451, 458 (Bankr.S.D.Ohio 1995). The bankruptcy court held that a trade creditor with the same open account relationship with the debtor at the time of the LBO and at the time of the bankruptcy filing qualified as a creditor under Ohio Revised Code § 1336.04. *Id.* at 458–59 (citing *Official Unsecured Creditors' Committee v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869 (Bankr.N.D.Ill.1991)).

It is undisputed that at least two trade creditors with open accounts at the time of the LBO were creditors of the Debtor based on the same open accounts at the time of the bankruptcy filing. *Id.* at 458. The former shareholders argue that the Plaintiffs lacked standing because these two creditors' debts on the date of the LBO were not based on the same invoices as their debts at the bankruptcy filing.

The BAP rejected this argument in *Belfance v. Bushey (In re Bushey),* 210 B.R. 95 (6th Cir. BAP 1997). Relying in part on the bankruptcy court decision in this case, the

BAP held "[i]n an open account context, the 'existing' creditor relationship is not defined by the balance on the account; it is the availability and continuous use of the credit facility that determines whether an appropriate creditor interest is present against which to measure the propriety of a conveyance." *Id.* at 102. The bankruptcy court correctly determined that the Plaintiffs had standing to pursue an action under Ohio Revised Code § 1336.04.

**2. The Debtor did not receive fair consideration in exchange for the $840,-000 paid to the former shareholders and the guarantee of GLL's $3 million note to the former shareholders.**

■ One element of a fraudulent conveyance under Ohio Revised Code § 1336.04 is a lack of "fair consideration" flowing to the transferor, here the Debtor. "Fair consideration" is given for property or an obligation under the Ohio Revised Code:

(A) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

(B) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

OHIO REV.CODE ANN. § 1336.03 (Anderson 1979 & Supp.1986) (repealed 1990).

Whether there was fair consideration requires consideration of "all the surrounding circumstances to determine whether the transaction is fair...." *John Ownbey Co. v. Commissioner,* 645 F.2d 540, 545 (6th Cir. 1981). "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred [and obligations incurred]...." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 646 (3d Cir.1991) (interpreting "reasonably equivalent value" under § 548 of the Bankruptcy Code), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

The former shareholders argue that consideration flowed to the Debtor from two sources: (1) the Bank extended loans to the Debtor; and (2) the Debtor received the benefit of new management with the capacity and talent to develop the Debtor's business. On these undisputed facts, we agree with the bankruptcy court's conclusion that neither the opportunity to incur debt nor new management was "fair consideration" under Ohio Revised Code § 1336.04. *Structurlite,* 193 B.R. at 456 (citing *Murphy v. Meritor Savs. Bank (In re O'Day Corp.),* 126 B.R. 370, 395 (Bankr.D.Mass.1991); *Moody v. Security Pac. Bus. Credit, Inc.,* 127 B.R. 958, 976 (W.D.Pa.1991), *aff'd,* 971 F.2d 1056 (3d Cir. 1992)). The Bank loaned the Debtor $1 million in connection with the LBO. The loan was secured by the Debtor's Hebron facility. Debtor in turn loaned the proceeds to GLL and those proceeds went to the former shareholders, not to the Debtor. GLL gave the Debtor an unsecured note evidencing this loan – a note that was worthless unless the Debtor upstreamed value to its new shareholder, GLL. The Debtor also guaranteed GLL's $3 million note to the former shareholders for the remainder of the purchase price. These transactions produced no direct benefit for the Debtor. The Appellants offered no evidence of the value of the indirect benefits they tendered as items of value, and their speculative value is not fair consideration.

**3. There are material, disputed facts with respect to whether the LBO rendered the Debtor insolvent.**

■ Ohio Revised Code § 1336.02 defines "insolvency:"

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

OHIO REV.CODE ANN. § 1336.02 (Anderson 1979 & Supp.1986) (repealed 1990).

The bankruptcy court concluded "[t]he UFCA standard for insolvency, ..., calls for a modified balance sheet approach combined with an expanded equitable insolvency analysis." *Structurlite,* 193 B.R. at 459. "[I]n the

context of a stock-purchase LBO ..., the assets should be valued on a going concern basis unless bankruptcy is 'clearly imminent' on the date of the LBO." *Id.* at 460 (citing *Moody v. Security Pac. Bus. Credit, Inc.,* 971 F.2d at 1067). In a transaction between "unrelated parties at arms length with no allegations that the negotiated price ... was artificially low," the bankruptcy court raised a presumption that "the present fair saleable value of the Debtor's assets, at the time of the LBO, was equal to the price of $4,000,000 negotiated for the stock transfer." *Id.*

Against this presumed asset value of $4 million, the bankruptcy court weighed the $1 million Bank loan and the $3 million guarantee. The $1 million loan from the Bank was a direct obligation of the Debtor that could only be repaid by GLL with funds upstreamed from the Debtor. *Id.* The Debtor's guarantee of GLL's note to the former shareholders was merely a disguised direct obligation of the Debtor. Those two debts totaled $4 million, without consideration of the other debts incurred by the Debtor in connection with the LBO. The bankruptcy court concluded "no genuine issue of material fact exists with respect to the insolvency of the debtor immediately following the LBO." *Id.* at 461.

In response to the Plaintiffs' motion for summary judgment, the Appellants offered the affidavit of Sion W. Digman, a certified public accountant. In his 18–page affidavit, Mr. Digman unequivocally expressed an opinion that "Structurlite was solvent following the buyout." The former shareholders contend that Mr. Digman's affidavit raised a genuine issue of material fact with respect to the Debtor's solvency immediately following the LBO. We agree.

Mr. Digman correctly recognized that the valuation standard under Ohio fraudulent conveyance law was "fair saleable value." He described a methodology for calculating the "fair saleable value" of Structurlite's assets that included personal knowledge of Structurlite's assets, review of audited financial statements prepared by other accountants, adjustments to historical balance sheets to reflect going concern asset values and consideration of contemporaneous asset valuations performed for insurance purposes. The reconstructed balance sheet he offered shows a "net worth" for Structurlite after the LBO of more than $1.7 million. Digman's opinion accounted for the new liabilities incurred as part of the LBO. The most important appraisal on which he relied is dated June 4, 1986 – two days before the LBO closed. Reviewed, as we must, in the light most favorable to the Defendants, the Digman affidavit is evidence that the fair saleable value of the Debtor's assets exceeded its liabilities after the LBO.

The bankruptcy court's opinion on summary judgment does not mention Digman's affidavit. There is no finding that Digman was not competent to express an expert opinion with respect to Structurlite's solvency. On appellate review of summary judgment we cannot cross examine Digman to determine the reliability of the information he collected and used in reaching his opinion. "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact finding] functions.... [On summary judgment] [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Swekel v. City of River Rouge,* 119 F.3d 1259, 1261 (6th Cir.1997) (internal quotations and citations omitted), *cert. denied,* — U.S. —, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998). Digman's affidavit generates a disputed, material issue of fact.

The bankruptcy court's grant of summary judgment is not saved by its use of a presumption within the insolvency calculation. The bankruptcy court "presume[d] that the present fair saleable value of the debtor's assets, at the time of the LBO, was equal to the price of $4 million negotiated for the stock transfer." *Structurlite Plastics,* 193 B.R. at 460. Rule 301 of the Federal Rules of Evidence explains that a presumption only allocates the burden of proof in the sense of which party must go forward with evidence:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does

not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. FED.R.EVID. 301.

The presumption that Structurlite's "fair saleable value" was equal to the negotiated stock sale price was a "bursting bubble" that "completely vanishe[d] upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed.Cir.1992) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Del Vecchio v. Bowers*, 296 U.S. 280, 286–87, 56 S.Ct. 190, 193–94, 80 L.Ed. 229 (1935)). We are not free to weigh the evidence of sale price more heavily than the Digman affidavit or to disregard this other evidence of value. *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994) ("[W]hen the nonmoving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true."). "Although purchase price may be highly probative of a company's value immediately after a leveraged buyout, it is not the only evidence." *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d at 1067. The presumption employed by the bankruptcy court was rebutted "upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact." *Bratton v. Yoder Co. (In re Yoder Co.)*, 758 F.2d 1114, 1118 (6th Cir.1985) (quoting 10 MOORE'S FEDERAL PRACTICE § 301.04[2] (2d ed.)). The Appellants are entitled to a trial with respect to the insolvency element of the Plaintiffs' burden of proof.

**4. The former shareholders are not shielded from recovery of a fraudulent conveyance by the "good faith transferee" defense in 11 U.S.C. § 550(b)(1).**

■ Sections 550(a) and (b) of the Bankruptcy Code provide:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under sections 544, 545, 547, 548, 549, 533(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from –

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) & (b) (1986).

The former shareholders argue they are protected by the safe harbor in 11 U.S.C. § 550(b) because GLL, not the former shareholders, was the initial transferee of the $840,000 produced by the LBO. In support, the former shareholders point to the loan and security agreements as evidence that the parties intended a multi-tier transaction in which the $840,000 passed from the Debtor to GLL, and from GLL to the former shareholders.

The Plaintiffs submitted the affidavit of Mr. Carl C. Farrar, a senior vice president of the Bank, stating that he personally delivered to the former shareholders cashier's checks purchased by the Debtor with proceeds from the LBO loans. Copies of the cashier's checks revealed the Debtor was the "remitter" to the former shareholders. The former shareholders produced no contrary evidence.

The bankruptcy court correctly concluded that the former shareholders were initial transferees of the $840,000 from the Debtor and did not qualify for the § 550(b) "good faith transferee" defense. *SPC Plastics Corporation v. Griffith (In re Structurlite Plastics Corp.)*, 214 B.R. 316, 319 (Bankr. S.D.Ohio 1997). It is undisputed that the Debtor purchased cashier's checks upon which the former shareholders were the

named payees and the Debtor the remitter. The Bank delivered the checks directly to the former shareholders. GLL was not an intermediary in fact. That the parties may have intended otherwise puts no material fact in dispute. The former shareholders were initial transferees. The § 550(b) defense is not available.

## C. Equitable Subordination.

■ The bankruptcy court granted additional or alternative relief that the claims of the former shareholders relating to the $3 million guarantee were subordinated to the claims of general unsecured creditors. *Structurlite*, 193 B.R. at 464.[4] The facts with respect to subordination are not in dispute; but the former shareholders contend that the bankruptcy court mistakenly adopted a legal standard that permits equitable subordination under 11 U.S.C. § 510(c) without proof of inequitable conduct. The bankruptcy court found that "undisputed facts lead to the conclusion that the $3,000,-000 note GLL executed ... and the Debtor's guarantee of that note represent, in essence, a redemption of the [former shareholders'] stock interests in the Debtor.... GLL had no means to pay that obligation.... [T]he Debtor received no consideration for its guarantee.... [W]hatever claims the Defendants are asserting against the bankruptcy estate arising from the $3,000,0000 guarantee are more appropriately characterized as 'claims' on account of their equity interests. Those equity interests are necessarily subordinate to the claims of unsecured creditors of this insolvent Debtor." *Id.* This outcome is consistent with the evolving law of equitable subordination in the Sixth Circuit.

Section 510(c) of the Bankruptcy Code provides, in pertinent part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

11 U.S.C. § 510(c) (1986).

In *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712, 717 (6th Cir.1992), the Sixth Circuit observed "[t]he legal standard for establishing equitable subordination was set forth in *[Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977)]. Most courts have uniformly followed and applied the *Mobile Steel* test, requiring the following three conditions to be shown by a preponderance of the evidence to justify equitable subordination." *Id.* at 717–18. Those three conditions are:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Id.* (quoting *Mobile Steel*, 563 F.2d at 699–700). *See also Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir.1991); *United States v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 942 F.2d 1055, 1061 (6th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992); *Cullen Elec. Co. v. Bill Cullen Elec. Contracting Co. (In re Bill Cullen Elec. Contracting Co.)*, 156 B.R. 235 (Bankr.N.D.Ill. 1993).

In *United States v. Noland (In re First Truck Lines, Inc.)*, 48 F.3d 210 (1995), *rev'd*, *United States v. Noland*, 517 U.S. 535, 541, 116 S.Ct. 1524, 1527, 134 L.Ed.2d 748 (1996),[5]

---

4. The bankruptcy court found the subordination question premature as to the $840,000 because no demand for repayment had been made. Although a judgment for $840,000 has since been entered against the former shareholders, *Structurlite*, 214 B.R. at 318, the bankruptcy court has never reconsidered the subordination request.

The December 2, 1997, judgment subordinates claims that total $3,458,967.53. This does not appear to include the initial $840,000 payment.

5. In *Noland*, the Supreme Court held that a bankruptcy court's exercise of equitable subordination must not have the "inevitable result" of

the Sixth Circuit refined its position on subordination under § 510(c):

> A review of the sketchy legislative history on Section 510(c) reveals a statement by both of the leading legislators on this issue referring to penalties as a type of claim susceptible to subordination. The legislative history also reveals that Congress intended the courts to continue to develop the principles of equitable subordination. Therefore, we do not believe that Congress intended to arrest the development of the principles of equitable subordination as of 1978. *Neither do we believe that the development of this area of law is restricted to cases of creditor misconduct.* Compelling reasons of justice and equity, as well as our interpretation of the plain language of the statutes, and the legislative history regarding the purposely undefined phrase "principles of equitable subordination," move this Court to agree with the other Circuits that nonpecuniary loss tax penalty claims are one type of claim subject to equitable subordination.

*First Truck,* 48 F.3d at 218 (emphasis added).

A number of courts, consistent with this broader articulation of subordination under § 510(c), have recognized "no fault subordination" that looks to the nature and origin of the claim. *See Envirodyne Indus., Inc. v. American Express (In re Envirodyne Indus., Inc.),* 176 B.R. 825, 831 (Bankr.

N.D.Ill.1995). Stock redemption claims, for example, have been the subject of no fault subordination in a number of cases.[6] See *In re Main St. Brewing Co., Ltd.,* 210 B.R. 662 (Bankr.D.Mass.1997); *Ferrari v. Family Mutual Savs. Bank; In re New Era Packaging, Inc.),* 186 B.R. 329 (Bankr.D.Mass.1995); *Envirodyne Indus.,* 176 B.R. at 829–31; *In re SPM Mfg. Corp.,* 163 B.R. 411, 413–16 (Bankr.D.Mass.1994). *See also Liebowitz v. Columbia Packing Co.,* 56 B.R. 222 (D.Mass. 1985), *aff'd,* 802 F.2d 439 (1st Cir.1986) (per curiam); *Weisman v. Goss (In re Hawaii Corp.),* 694 F.2d 179 (9th Cir.1982); *Robinson v. Wangemann,* 75 F.2d 756 (5th Cir. 1935).

> As these courts see it, to give the redemption claim parity with the claims of other creditors is opposed to the priority which creditors enjoy over stockholders in bankruptcy. They subordinate the redemption claims without regard to whether the corporation was solvent at the time of the redemption agreement or whether the agreement was valid under applicable corporate law.

*In re Main Street Brewing,* 210 B.R. at 665 (internal citation omitted). "[A]s a general rule equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation." *In re Stirling Homex Corp.,* 579 F.2d 206, 211 (2d Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979) (favorably

equitably subordinating "every tax penalty." *Noland,* 517 U.S. at 541, 116 S.Ct. 1524. *Noland* reversed the Sixth Circuit's decision in *United States v. Noland (In re First Truck Lines, Inc.),* 48 F.3d 210 (1995), to the extent that the Sixth Circuit approved subordination of all tax penalty claims. *Noland,* 517 U.S. at 543, 116 S.Ct. 1524. The Supreme Court did not reach the question whether equitable subordination requires misconduct; a question answered in the negative by the Sixth Circuit in *First Truck. Id.* at 542, 116 S.Ct. 1524 ("[W]e need not decide today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated."). Because the Supreme Court did not reach the issue whether creditor misconduct is necessary for equitable subordination under § 510, the Sixth Circuit's *First Truck* is controlling on that issue. *See Gordon Sel–Way, Inc. v. United States (In re Gordon Sel–Way, Inc.),* Case No. 95–4485, 1997 WL 154114 at *2 (Bankr. E.D.Mich.), *aff'd,* 217 B.R. 221 (E.D.Mich.1997)

("*First Truck* teaches us that we need not find creditor misconduct and that [sic] *Noland* teaches us that in the absence of creditor misconduct, we must find some basis for equitable subordination, other than what is perforce the inherent and natural result of the Congressionally legislated "categorical reordering of priorities." ").

6. The principal other type of claim courts routinely subordinated under this no fault standard was the tax penalty claim. To the extent that a tax penalty was subordinated merely because it was a tax penalty, the Supreme Court ended such subordination in *Noland.* Punitive damages claims have also been subordinated as penalty claims under this standard. *In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y. 1986), *aff'd in part, rev'd in part,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd,* 843 F.2d 636 (2d Cir. 1988); *In re Colin,* 44 B.R. 806, 810 (Bankr. S.D.N.Y.1984).

cited by the Sixth Circuit in *First Truck* ) (internal quotes and citation omitted). "In the case of a stock redemption, the court[s] look[ ] at the substance of the transaction, as opposed to its form, in deciding to equitably subordinate the claims of a former shareholder, turned creditor, to the claims of the general unsecured creditors." *Envirodyne*, 176 B.R. at 831 (citing *SPM Mfg.,* 163 B.R. at 414).

 Here, the bankruptcy court found the substance of the former shareholders' claims to be a stock redemption. We agree. Although the Sixth Circuit has not addressed no fault subordination outside of tax penalties, *First Truck* is unequivocal that subordination under § 510(c) is not restricted to cases of creditor misconduct. *First Truck,* 48 F.3d at 215. The bankruptcy court's subordination of the former shareholders' claims to the claims of general unsecured creditors was not error.

## V. CONCLUSION

The judgments of the bankruptcy court granting summary judgment in favor of the Plaintiffs are **AFFIRMED in part and REVERSED in part**, and this matter is **REMANDED** for further proceedings consistent with this decision.

STOSBERG, concurring in part, dissenting in part.

I concur in the Panel's judgment except with respect to insolvency. Although the bankruptcy court's opinion did not mention the affidavit of Sion W. Digman, during oral argument, the parties freely conceded that the bankruptcy court thoroughly discussed the Digman affidavit during a four hour hearing on the summary judgment motion. Under the federal rules, summary judgment is not rendered impossible simply because the nonmoving party produced an expert to support its position. *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993), *cert. denied,* 511 U.S. 1126, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994). Rather, the affidavit produced must be sufficient to withstand a summary judgment motion and therefore, must set forth facts showing there is a genuine issue for trial. *Monks v. General Elec.*

*Co.,* 919 F.2d 1189, 1193 (6th Cir.1990). The mere filing of a counter affidavit does not automatically create a genuine issue of material fact and thus defeat a summary judgment motion.

Digman's conclusory statements ten years after the LBO sale are not direct evidence of value, and his averments fall woefully short of qualifying as competent evidence of the Debtor's solvency. The Digman affidavit did not and cannot refute the amount of the sales price, which the bankruptcy court found equated to the "fair saleable value" of the company. The bankruptcy court appropriately declined to find that the Digman affidavit raised a genuine issue of material fact with reference to the Debtor's insolvency.