In re VALLEY–VULCAN MOLD
COMPANY, Debtor.

Official Unsecured Creditors Committee of Valley–Vulcan Mold Company, Plaintiff–Appellant,

v.

Ampco–Pittsburgh Corporation,
Defendant–Appellee.

No. 99–4129.

United States Court of Appeals,
Sixth Circuit.

Feb. 26, 2001.

Before MERRITT, WELLFORD, and SILER, Circuit Judges.

SILER, Circuit Judge.

Plaintiff Official Unsecured Creditors Committee of Valley–Vulcan Mold Company ("Committee") filed suit against the defendant Ampco–Pittsburgh Corporation ("Ampco"), seeking to avoid transfers of certain property and the payment of certain debts arising from the formation and subsequent bankruptcy of the Valley–Vulcan Mold Company ("Valley–Vulcan"). The bankruptcy court found in favor of Ampco and, after unsuccessfully appealing to the Bankruptcy Appellate Panel ("BAP"), the Committee appeals to this court. We affirm on all matters.

## I. BACKGROUND

In 1987, Valley–Vulcan was formed as an Ohio partnership through the efforts of Ampco, Vulcan Inc. ("Vulcan"), a subsidiary of Ampco, Microdot Inc. ("Microdot"), and the Valley Mould Corporation ("Valley"), a subsidiary of Microdot. All four entities signed a Joint Venture Agreement ("Agreement") that paved the way for the formation of Valley–Vulcan, a partnership that combined Vulcan's and Valley's mold operations.

In 1990, Valley–Vulcan filed for Chapter 11 bankruptcy. Following Valley–Vulcan's bankruptcy, the Committee filed suit in bankruptcy court against all four signatories to the Agreement. At the time, however, Ampco was the only viable business among the four. At trial, the Committee asserted the general theory that Vulcan and Valley–Vulcan should not be regarded as separate legal entities from Ampco. After a trial, the bankruptcy judge ruled against the Committee and in favor of Ampco on all matters. The BAP affirmed on all matters.

## II. STANDARD OF REVIEW

"Whether an appeal comes to our court by way of a district court or the [BAP], our review is of the bankruptcy court's decision." *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 696 n. 1 (6th Cir.1999). We review the bankruptcy court's conclusions of law de novo, and its factual determinations for clear error. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir.1998).

## III. DISCUSSION

### a) Fraudulent Conveyance

■ The Committee claims that all transfers among Valley–Vulcan, Vulcan and Ampco were fraudulent conveyances under Ohio law, and that the Committee was entitled to recover each of these transfers pursuant to 11 U.S.C. § 544(b) and

applicable state law. Section 544 permits a Committee to seek avoidance of fraudulent transfers that are voidable under applicable state law by unsecured creditors. *See, e.g., SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 30–31 (6th Cir.BAP 1998). Specifically, the Committee argues that the distribution of $9 million to Ampco and the grant of a lien to Ampco to secure a loan were fraudulent conveyances. The bankruptcy judge reviewed all transactions and correctly found that the Committee failed to prove a fraudulent conveyance under any of the four relevant fraudulent conveyance provisions of the Ohio Revised Code then in effect. *See* Ohio Rev.Code Ann. §§ 1336.04–1336.07 (Anderson 1979).

Sections 1336.04–1336.06 of the Ohio Revised Code require that the Committee prove only that Ampco made the questioned transfers with a constructive intent to defraud. Section 1336.07 requires that Ampco made the transfers with actual intent to defraud. A transfer made for fair consideration is fatal to a cause of action under §§ 1336.04–1336.06 and constitutes a defense under § 1336.07. *See Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 37 Ohio App.3d 162, 524 N.E.2d 915, 918–19 (1987). The Committee provided no evidence of actual intent to defraud, so the bankruptcy judge was clearly correct to rule against the Committee under § 1336.07. And, although the Committee presented evidence under §§ 1336.04–1336.06, that evidence was overcome by Ampco's showing that fair consideration was given for each questioned conveyance.

The first transfers that the Committee alleged to be fraudulent were a $9 million transfer from Valley–Vulcan to Vulcan and, then, from Vulcan to Ampco. Expert testimony and Vulcan's market value showed that the $9 million payment from Valley–Vulcan to Vulcan was fair consideration paid to equalize partners' individual contributions to the Valley–Vulcan partnership. Likewise, the $9 million transfer from Vulcan to Ampco was made for fair consideration. That payment was made because of a legitimate intercompany debt owed by Vulcan to Ampco and a distribution of dividends to shareholders. The repayment of intercompany debt was a dollar-for-dollar transaction that, by definition, satisfied fair consideration.

And, Ampco gave fair consideration for its lien over Valley–Vulcan assets. When Valley–Vulcan defaulted on its loan payment. Ampco paid the outstanding $3.25 million balance on Valley–Vulcan's loan and, under a security agreement, it then obtained a secured claim against Valley–Vulcan for $3.25 million. Since it was simply recouping the $3.25 million dollars that it had already paid on Valley–Vulcan's behalf, Ampco did not profit from the security agreement.

Because there was ample proof that all monetary transfers among Valley–Vulcan, Vulcan, and Ampco were for fair consideration, the bankruptcy court did not clearly err by holding that such transfers were not fraudulent conveyances.

### b) Expert Testimony

■ Next, the Committee claims that the bankruptcy court erred in allowing the expert testimony of Jeffrey Greene on the grounds that solvency expertise was not a widely accepted field in appropriate professional venues. Greene testified as to the solvency of Valley–Vulcan, and the value of Vulcan, at the time Valley–Vulcan was formed.

"The trial court has broad discretion in admitting and excluding expert testimony and we will sustain the Court's action unless it is manifestly erroneous." *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 962 (6th

Cir.1990). The admissibility of expert testimony is governed by Fed.R.Evid. 702. "The inquiry envisioned by Rule 702 . . . is a flexible one," *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and it "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. American Honda Motor Co.,* 151 F.3d 500, 516 (6th Cir.1998) (internal citations omitted). In determining whether a witness qualifies as an expert, a judge looks at the reasoning or methodology employed by the expert, whether the reasoning or methodology has been tested or subjected to peer review, the known rate of error if one can be determined, and may also consider whether the reasoning or methodology has been generally accepted within the relevant professional community. *See Daubert,* 509 U.S. at 593–95. But *Daubert's* list of factors is not definitive and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The bankruptcy judge did not abuse his discretion by permitting Greene's expert testimony. Greene's qualifications as an expert were well established, and his valuations were based on discounted cash-flow valuation, a well-recognized methodology for determining a business's going-concern values. *See United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985, 992–93 (4th Cir.1981) (en banc). Based on the bankruptcy court's articulated desire for assistance and Greene's qualifications, the court's determination that Greene qualified as an expert witness satisfied Fed.R.Evid. 702.

#### c) Alter Ego Doctrine

The Committee also claims that Ampco is the alter ego of Vulcan and, therefore, that it is liable for Vulcan's debts. It alleges that Ampco's chief officers controlled Vulcan's board of directors and that Ampco stripped Vulcan of assets, including the previously discussed $9 million of loan proceeds transferred from Vulcan to Ampco.

Because this is a diversity action, state law is controlling. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "When and how state law applies to a particular case is a matter on which the state supreme court has the last word." *Houston v. Dutton,* 50 F.3d 381, 385 (6th Cir.1995). Federal courts anticipate how a state's supreme court would rule on an issue of state law only where the law of that state is unsettled. *See C&H Entm't, Inc. v. Jefferson County Fiscal Court,* 169 F.3d 1023, 1025 (6th Cir. 1999).

In reaching its determination that Ampco was not the alter ego of Vulcan, the bankruptcy court applied the alter ego test established by the Ohio Supreme Court in *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos.,* 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993). The Committee argued on appeal that the bankruptcy court committed legal error by applying the *Belvedere* alter ego test and, instead, that it should have applied the alter ego test recognized in *Bucyrus–Erie Co. v. General Prods. Corp.,* 643 F.2d 413 (6th Cir.1981).

In 1981, the Sixth Circuit anticipated Ohio's alter ego doctrine because the Ohio Supreme Court had not yet settled that doctrine. *See id.* But in 1993, the Ohio Supreme Court explicitly settled Ohio's alter ego law. *See Belvedere,* 617 N.E.2d at 1075. For alter ego to exist, the *Belvedere* court held that:

the corporate form may be disregarded and individual shareholders held liable

for corporate misdeeds when 1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, 2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and 3) injury of unjust loss resulted to the plaintiff from such control and wrong.

*Id.*

Correctly applying *Belvedere,* the bankruptcy court did not err in finding no alter ego between Ampco and Vulcan. Beyond mere assertion, the Committee failed to provide any evidence that Ampco committed any "fraud or illegal act," meaning that it failed to satisfy the second prong of *Belvedere.*

#### d) Joint Venture Agreement

■ The Committee contends that the bankruptcy court erred in holding that the Agreement did not pose direct, independent liability on Ampco for the debts of Vulcan and Valley–Vulcan. Under Pennsylvania law, the governing law of the Agreement, certain factors are essential, but not determinative, for a finding of liability under joint venture: 1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; 2) profits must be shared among the parties; 3) there must be a joint proprietary interest and a right of mutual control over the subject matter of the enterprise; and 4) usually, there is a single business transaction rather than a general and continuous transaction. *McRoberts v. Phelps,* 391 Pa. 591, 138 A.2d 439, 443–44 (Pa.1958). However, the existence of a joint venture depends on the facts and circumstances of each particular case. *See*

*id.* Its existence or non-existence depends upon what the parties intended in associating together. *See id.* at 443.

■ The bankruptcy court correctly concluded that the Agreement was simply a list of requirements that the four parties had to satisfy before Valley–Vulcan could form. Nowhere did the Agreement state that Ampco would be bound in any form of joint venture or partnership. In fact, the definitions section of the Agreement excluded Ampco as a partner. Based on the Agreement's language, the bankruptcy court did not err by concluding that Ampco was not a joint venturer responsible for the debts of Vulcan and Valley–Vulcan.

#### e) Scheduling Issues

The Committee also claims that the bankruptcy court erred in denying several motions to extend the discovery deadline and postpone trial. But the scope of discovery is within the broad discretion of a trial court. *See Emmons v. McLaughlin,* 874 F.2d 351, 356–57 (6th Cir.1989). When reviewing a trial court's decision to limit discovery, we will intervene only if the decision was an abuse of discretion resulting in substantial prejudice. *See Ghandi v. Police Dep't of Detroit,* 747 F.2d 338, 354 (6th Cir.1984).

The Committee was accorded ample time and opportunity for discovery. The bankruptcy court set reasonable dates for discovery cut-off and trial and did not err in holding the Committee to those dates. In denying the Committee's request to postpone discovery cut-off and trial, the bankruptcy court noted that the Committee was aware of the timetables and that the Committee had been previously authorized to hire additional counsel to ensure that it would meet existing deadlines. Given the wide discretion accorded to it, the bankruptcy court did not abuse that discretion by denying the Committee's mo-

tions to extend discovery and postpone trial where the Committee's behavior appeared dilatory and tactical.

#### f) Attorney Disqualification

The Committee argues that the bankruptcy court erred by denying its motion to disqualify the law firm of Paul, Weiss from representing Ampco. It contends that Paul, Weiss had a conflict of interest in representing Ampco against the Committee because Paul, Weiss acted as special counsel to Valley–Vulcan, Vulcan, and Ampco in matters relating to the Agreement and financing. The court's review of a [bankruptcy] court's decision regarding disqualification of counsel is a generous one and "[t]he [bankruptcy] court is to be given wide latitude." *United States v. Mays*, 69 F.3d 116, 121 (6th Cir.1995).

The Sixth Circuit has articulated a three-part test for determining whether disqualification based on a conflict of interest is warranted: 1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; 2) the subject matter of those relationships was/is substantially related; and 3) the attorney acquired confidential information from the party seeking disqualification. *See Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882, 889 (6th Cir.1990). Courts have disallowed disqualification on the basis of waiver or estoppel where the moving party has failed to move for disqualification in a timely manner. "It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) (denying motion for disqualification where it was asserted just prior to the scheduled trial date).

■ The Committee waited until less than a week before trial to file a motion seeking to disqualify Ampco's lead counsel, Paul, Weiss. By employing delay tactics and waiting so long to file its disqualification motion, the Committee waived its right to disqualify Paul, Weiss. And, even if the Committee did not waive its right, the bankruptcy court still did not err. The court's finding that no actual conflict of interest existed between Paul, Weiss and the parties in this case supported the conclusion under *Dana* that the bankruptcy court did not err by denying the Committee's disqualification notice.

#### g) Equitable Subordination

■ Finally, the Committee argues that the bankruptcy court erred in refusing to equitably subordinate Ampco's claims to those of Valley–Vulcan's unsecured creditors. A court may equitably subordinate a claim where 1) the claimant is guilty of inequitable conduct such as fraud, illegality or breach of fiduciary duty; 2) the misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and 3) the equitable subordination of the claimant is not inconsistent with the provisions of the Bankruptcy Code. *See First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 718 (6th Cir.1992). " '[S]ubordination requires some showing of suspicious, inequitable conduct' " even beyond initial undercapitalization of an enterprise. *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 583 (9th Cir.1998) (quotations omitted).

The Committee's mere assertions of fraud, misconduct, and undercapitalization were not supported by the record. Thus,

the bankruptcy court did not err by denying the Committee relief.

AFFIRMED.