In re VALLEY–VULCAN
MOLD CO., Debtor.

Official Unsecured Creditors Committee of Valley–Vulcan Mold
Co., Plaintiff–Appellant,

v.

Ampco–Pittsburgh Corp.,
Defendant–Appellee.

BAP No. 98–8070.

United States Bankruptcy Appellate Panel
of the Sixth Circuit.

Argued June 2, 1999.

Decided Aug. 19, 1999.

ture bankruptcy cases where the issues presented here arise.

John A. Hallbauer, Buckley, King & Bluso, Cleveland, OH, argued and on brief, for Appellant.

Harry W. Greenfield, Buckley, King & Bluso, Cleveland, OH, Michael A. Gallo, Nadler, Nadler & Burdman, Youngstown, Ohio, were on brief, for Appellant.

Carey R. Ramos, Wharton & Garrison, argued and on brief, for Appellee.

Carey R. Ramos, Wharton & Garrison, New York City, Richard Gurbst, Squire, Sanders & Dempsey, Cleveland, Ohio, were on brief, for Appellee.

Before RHODES, STOSBERG, and WALDRON, Bankruptcy Appellate Panel Judges.

## OPINION

The Debtor, Valley–Vulcan Mold Company ("Valley–Vulcan"), was an Ohio partnership created in 1987 through the efforts of four entities, Ampco–Pittsburgh Corporation ("Ampco"), Vulcan, Inc. ("Vulcan"), which was a subsidiary of Ampco, Microdot, Inc. ("Microdot"), and Valley Mould Corporation ("Valley"), which was a subsidiary of Microdot. Following Valley–Vulcan's Chapter 11 filing in 1990, the Official Unsecured Creditors Committee of Valley–Vulcan Mold Company ("the Committee") commenced an adversary proceeding against all four entities; however, only Ampco remained a viable business at that time. Following a five-day trial in 1993, the bankruptcy court entered judgment in favor of Ampco, holding the Committee had failed to prove that certain conveyances were fraudulent under applicable Ohio law, that it was entitled to imposition of liability against Ampco under Ohio's alter ego doctrine or under a joint venture agreement, or that it was entitled to equitable subordination of Ampco's claims. Prior to trial, the bankruptcy

court denied the Committee's motion for additional discovery, and, during the trial, the court denied the Committee's motion to disqualify Ampco's counsel and overruled the Committee's objection to the admissibility of certain expert testimony. The Committee appeals each ruling of the bankruptcy court. The judgment of the bankruptcy court is **AFFIRMED**.

## I. ISSUES ON APPEAL

This appeal presents the following issues: (1) whether the bankruptcy court erred in determining that neither a $9 million payment made by Valley–Vulcan Mold Company to Vulcan, Inc. and subsequently to Ampco, nor the granting of a security interest to Ampco in return for Ampco's guaranty of Valley–Vulcan's performance under an industrial development bond constituted a fraudulent conveyance; (2) whether the bankruptcy court erred in holding that the alter ego doctrine was inapplicable where the Committee was unable to prove Ampco had used its alleged control over Vulcan to commit a fraudulent or illegal act; (3) whether the bankruptcy court erred in holding that the Committee failed to prove circumstances warranting the equitable subordination of Ampco's claims to those of the unsecured creditors; (4) whether the bankruptcy court erred in holding the joint venture agreement did not impose liability on Ampco for the debts of Vulcan or Valley–Vulcan; (5) whether the bankruptcy court erred in admitting expert testimony on matters of valuation and solvency; (6) whether the bankruptcy court erred in denying the Committee's motion for additional discovery; and (7) whether the bankruptcy court erred in denying the Committee's motion, filed on the eve of trial, to disqualify Ampco's counsel on the basis of conflict of interest.

## II. JURISDICTION AND STANDARD OF REVIEW

■ The Panel has jurisdiction over final orders of the bankruptcy courts of the Northern District of Ohio pursuant to 28 U.S.C. § 158(a)(1) and (c). The bankruptcy court's order disposing of the Committee's claims is a final appealable order as it "'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Simon v. Chase Manhattan Bank (In re Zaptocky)*, 232 B.R. 76, 78 (6th Cir. BAP 1999) (citations omitted).

■■ The bankruptcy court's determination of the applicable standard for imposition of alter ego liability under Ohio law and the court's conclusion regarding the operation of the joint venture agreement are conclusions of law subject to the de novo standard of review. *In re Zaptocky*, 232 B.R. at 78. Under the de novo standard, the Panel determines the issue independently of the bankruptcy court's determination. *Id.* at 78–79 (citations omitted).

■ The bankruptcy court's denial of the Committee's request for equitable subordination of Ampco's claims, the court's denial of the Committee's motions for additional discovery and for disqualification of Ampco's counsel, and the court's decision to admit expert testimony over the Committee's objection, are reviewed for an abuse of discretion. *See, e.g., Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 583 (9th Cir.1998) (equitable subordination); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir.1998) (discovery); *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) (disqualification); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) (expert testimony). "'An abuse of discretion occurs only when the [bankruptcy] court "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard."'" *Sicherman v. Diamoncut, Inc. (In re Sol Bergman Estate Jewelers, Inc.)*, 225 B.R. 896, 899 (6th Cir. BAP 1998) (citations omitted).

■ The bankruptcy court's factual determinations are reviewed under the

clearly erroneous standard. *Sol Bergman,* 225 B.R. at 899.

The clearly erroneous standard requires this court to give deference to the finder of fact. As the Supreme Court explained:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Such deference to the trial court is necessary because the trial judge is in the best position to determine credibility of witnesses.

*Id.* at 904 (citations omitted).

### III. FACTS

Ampco is a publicly-held corporation headquartered in Pittsburgh, Pennsylvania and involved in a variety of manufacturing and steel-related business activities. In 1984, Ampco acquired all the stock of Vulcan, a leading manufacturer of steel ingot molds headquartered in Latrobe, Pennsylvania. Vulcan's operations included several businesses, but consisted primarily of Vulcan Mold and Iron Company ("Vulcan Mold & Iron") and the holding of stock in an entity known as Shepard Niles ("Shepard Niles"). Vulcan's ingot-mold business was concentrated in two plants. The first, located in Trenton, Michigan (the "Trenton Plant"), produced large molds of up to 100 tons primarily marketed to steel companies in the Midwest. The Trenton Plant had recently modernized its operations and had financed the modernization with an industrial development bond (the "Trenton IDB") granted on February 1, 1981 for actual financing of $5.4 million and held by Mellon Bank. The second plant, located in Latrobe, Pennsylvania (the "Latrobe Plant"), manufactured smaller specialty molds and enjoyed a broader customer base than the Trenton Plant although Latrobe produced fewer tons of molds overall.

In 1986 and 1987, changes within the steel industry, most notably the increasing use of the "continuous casting" process which does not use ingot molds in steel production, prompted many ingot mold manufacturers to pursue partnerships and mergers in order to remain competitive. The two options most seriously considered by Vulcan originated with the Underwood Group and Valley. The Underwood Group proposed to purchase Vulcan by acquiring Ampco's stock in Vulcan for $10.83 million and assuming all of Vulcan's liabilities, including the outstanding indebtedness on the Trenton IDB. However, Vulcan eventually rejected the Underwood Group's offer in order to pursue a partnership with Valley.

Valley was a wholly-owned subsidiary of Microdot, Inc., a closely-held corporation which filed a Chapter 11 case on June 13, 1993 in California. Valley operated a mold foundry at Hubbard, Ohio (the "Hubbard Plant") which produced large molds in competition with Vulcan's Trenton Plant. The respective management teams of Vulcan and Valley anticipated significant synergies from a partnership between the two entities. Valley's Hubbard Plant had been fitted with state of the art electric furnaces and had reliable sources of hot metal for its foundry processes. In contrast, Vulcan's Trenton Plant had to rely upon outside sources of hot metal, which left it vulnerable to hot metal shortages, but enjoyed superior production capabilities with its modern sand system and had more experienced management which the parties believed could improve Valley's Hubbard operations. Also, consolidation of management, sales, and administration would lower costs for both parties, and a partnership would eliminate one ingot-mold manufacturer from an industry where steel manufacturers routinely dealt with at least two mold manufacturers at a

time to insure a reliable supply of ingot molds.

On July 14, 1987, Ampco, Vulcan, Microdot, and Valley executed a Joint Venture Agreement in which they agreed to form a partnership between Valley and Vulcan at a later date. The Joint Venture Agreement provided that certain conditions must be met prior to the formation of the partnership, and otherwise constituted the parent-companies' consent to the subsidiaries' partnership. The Agreement further provided that, if formed, the resulting partnership would assume substantially all of the assets and liabilities of Valley's and Vulcan's ingot-mold operations.

On September 18, 1987, Valley and Vulcan executed a partnership agreement which created Valley–Vulcan, with Valley and Vulcan each becoming equal general partners in Valley–Vulcan. Valley and Vulcan each contributed to the partnership substantially all of the assets of their respective ingot mold operations, and Valley–Vulcan assumed substantially all of the liabilities of Valley and Vulcan related to their ingot mold businesses. To initially finance Valley–Vulcan, the partnership secured a $17 million line of revolving credit from Fidelcor Business Credit Corporation (the "Fidelcor Line of Credit").

While Valley required little in the way of preparation for entry into the partnership, Vulcan's diversity required the parties to engage in a number of transactions to facilitate its entry into the partnership. In assuming the assets and liabilities of Valley and Vulcan, Valley–Vulcan assumed responsibility for Vulcan's remaining indebtedness of $3.9 million on the Trenton IDB and took possession of Vulcan's assets. While it appears Mellon Bank was not secured on the Trenton IDB, Mellon's consent still was necessary to the transfer of Vulcan's assets to Valley–Vulcan and the substitution of Valley–Vulcan for Vulcan as the party liable on the IDB. To obtain Mellon's consent, Ampco agreed to guarantee Valley–Vulcan's repayment of the IDB. To secure repayment of any sums Ampco

was required to make on Valley–Vulcan's behalf as guarantor of the Trenton IDB, Ampco further entered into a Security and Subrogation Agreement with Valley–Vulcan which granted Ampco a security interest and priority lien in the assets of Valley–Vulcan.

As only the Vulcan Mold & Iron business was to be contributed to the Valley–Vulcan partnership, Vulcan's other assets (primarily the Shepard Niles stock) were transferred to Ampco prior to the creation of Valley–Vulcan. Finally, Vulcan's business was substantially more valuable than Valley's, resulting in the need to equalize their respective contributions to the partnership in which each would be an equal partner. The parties agreed that Valley–Vulcan would pay Vulcan $9 million for its additional value contributed. Valley–Vulcan paid this amount to Vulcan by drawing against its $17 million Fidelcor Line of Credit. Vulcan subsequently paid this amount to Ampco, which appears to have been partly on account of intercompany debt and partly in dividend from the partial liquidation of Vulcan.

The Valley–Vulcan partnership appears to have done well initially, and production at the Hubbard Plant improved significantly. However, during the Trenton Plant's summer idle period for its annual vacation shut-down in 1988, one of Trenton's primary customers and suppliers shifted part of its purchasing to a competitor of Trenton and also restricted its hot metal sales to Trenton. In the face of lowered volumes and a hot metal shortage, Valley–Vulcan decided to leave the Trenton Plant idle until the market environment improved. However, at the end of 1988, Valley–Vulcan made the shut-down permanent and concentrated Trenton's former operations at the Hubbard Plant. Further exacerbating Valley–Vulcan's difficulties in the wake of the Trenton shut-down was the emergence of significant new competitors combined with a substantial rise in the prices of scrap steel, which was used

heavily by Valley–Vulcan in the production of ingot molds.

Valley–Vulcan borrowed an additional $500,000 from Ampco in early 1990, for which Ampco took an additional security interest. However, Valley–Vulcan was unable to negotiate concessions with its labor force, and a strike forced Valley–Vulcan to close the Hubbard Plant in August 1990. Valley–Vulcan filed a Chapter 11 on October 2, 1990. Ampco eventually paid $3.25 million on its guaranty of the Trenton IDB, and thus emerged as a secured creditor of Valley–Vulcan based on this payment and its $500,000 loan to the partnership.

The Official Unsecured Creditors Committee of Valley–Vulcan Mold Company filed an adversary proceeding against Microdot, Valley, Ampco, and Vulcan, alleging several theories of recovery.[1] The Committee first alleged that the following transfers were fraudulent transfers avoidable under state law pursuant to 11 U.S.C. § 544(b): (1) Valley–Vulcan's payment of $9 million to Vulcan, which was then paid over to Ampco; (2) Valley–Vulcan's grant of a first priority lien to Ampco in return for Ampco's guaranty of the Trenton IDB; (3) Vulcan's transfer of the Shepard Niles stock to Ampco; and (4) the additional security interest granted by Valley–Vulcan in return for Ampco's $500,000 loan to the partnership. In the alternative, the Committee argued that the two security interests granted to Ampco by Valley–Vulcan were avoidable as preferences pursuant to 11 U.S.C. § 547. The Committee next alleged that Vulcan was merely the alter ego of Ampco, that Vulcan, as a general partner, was fully liable for the debts of Valley–Vulcan, and that the Committee should be permitted to hold Vulcan liable for the debts of Valley–Vulcan and pierce the corporate veil to hold Ampco liable for the debts of Vulcan. The Committee further sought to hold Ampco directly liable under the Joint Venture Agreement. Finally, the Committee argued that any claim held by Ampco should be equitably subordinated to the unsecured claims.

Applying Ohio fraudulent conveyance law in effect at the time of the transactions, the bankruptcy court determined that the Committee failed to prove its fraudulent conveyance claims under any applicable section of the Ohio Uniform Fraudulent Conveyance Act, former §§ 1336.04, 1336.05, 1336.06, and 1336.07, with regard to any transfer among Valley–Vulcan, Vulcan, and Ampco. The court also held that neither security interest granted by Valley–Vulcan constituted a preferential transfer. The bankruptcy court further held the Committee failed to prove its alter ego claims against Ampco, and that the Joint Venture Agreement did not impose liability on Ampco for any debts of Vulcan or Valley–Vulcan. Finally, the court found no merit in the Committee's argument for equitable subordination of Ampco's claims against the estate. The Committee timely appealed.

## IV. DISCUSSION

The bankruptcy court found that the Committee consistently failed to offer adequate or persuasive proof of its allegations during trial. The record on appeal fully supports the bankruptcy court's factual findings, and the Committee does not direct the Panel's attention to any facts in evidence which would cast doubt on the bankruptcy court's determinations. With regard to issues of law determined by the bankruptcy court and matters committed to the bankruptcy court's sound discretion, the Committee has similarly failed to persuade the Panel of any error in the bankruptcy court's determinations.

1. With regard to the Committee's claims against the other participants, the bankruptcy court held that Vulcan was liable for Valley–Vulcan's debts as a general partner of Valley–Vulcan, and the court granted a default judgment against Valley, which did not appear in the action. The action against Microdot was prevented by the automatic stay in Microdot's 1993 Chapter 11 filing.

## A. Fraudulent Conveyances

█ The Committee originally alleged that every transfer taking place among Valley–Vulcan, Vulcan, and Ampco constituted a fraudulent conveyance under Ohio law, and that the Committee was entitled to recover each of these transfers pursuant to 11 U.S.C. § 544(b) and applicable state law. The bankruptcy court examined every transaction in light of the Committee's allegations and concluded the Committee had failed to prove a cause of action under any relevant section of the Ohio Revised Code then in effect. *Official Unsecured Creditors Committee of Valley–Vulcan Mold Co. v. Microdot, Inc., et al. (In re Valley–Vulcan Mold Co.)*, Case No. 90–41593, Adv. No. 91–4056, slip op. at 4–19 (Bankr.N.D.Ohio Apr. 4, 1994). On appeal, the Committee asserts the bankruptcy court erred in finding that neither the $9 million payment nor the granting of the first priority lien to Ampco in exchange for its guaranty of the Trenton IDB were fraudulent conveyances.

11 U.S.C. § 544 permits the Committee to seek avoidance of fraudulent transfers under applicable state law. *See, e.g., SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 30–31 (6th Cir. BAP 1998). Sections 1336.04, 1336.05, 1336.06, and 1336.07 of the Ohio Uniform Fraudulent Conveyance Act effective at the time of the transfers, and as used in this opinion, provide:

Section 1336.04:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 1336.05:

> Every conveyance made and every obligation incurred without fair consideration, when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Section 1336.06:

> Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

Section 1336.07:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present or future creditors.

*In re Taubman*, 160 B.R. 964, 984, 987–988 (Bankr.S.D.Ohio 1993).

> [U]nder § 1336.04, the [Committee] must prove that the conveyances made or the obligations incurred by the Debtor were made while insolvent or which rendered the Debtor insolvent, and were made or incurred without fair consideration. Under § 1336.05, the [Committee] must show that every conveyance made or obligation incurred by the Debtor without fair consideration was made when the Debtor had unreasonably small capital. With respect to either § 1336.04 or § 1336.05, "[n]either the intent of the debtor nor the knowledge of the transferee need be proven." Lastly, under § 1336.06, the [Committee] must prove that every conveyance made or obligation incurred by the Debtor without fair consideration was made when the Debtor believed [it] would incur debts beyond [its] ability to pay as they matured.

*Id.* at 988 (internal citations omitted).

Under 1336.07, the Committee

must demonstrate that the conveyances were made with actual intent to hinder, delay, or defraud.... In determining whether such conveyances were made with actual intent, direct evidence of fraudulent intent is not necessary, and in most circumstances is unavailable. Consequently, "[d]ue to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved."

*Id.* at 984 (internal citations omitted).

 Recovery pursuant to §§ 1336.04, 1336.05, and 1336.06 requires the challenged transfer to have been made without fair consideration, *Taubman,* 160 B.R. at 988, while recovery under § 1336.07 requires the Committee to demonstrate some indicia of fraudulent intent. *Id.* at 984. However, even if the traditional badges of fraud give rise to an inference or presumption of fraudulent intent, the transferee can still rebut this presumption by showing the transaction was in fact made for fair consideration. *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio,* 37 Ohio App.3d 162, 524 N.E.2d 915, 918–919 (1987). Thus, the presence of fair consideration is fatal to a cause of action under §§ 1336.04, 1336.05, or 1336.06, and also constitutes a defense to an action brought under § 1336.07. Fair consideration was then defined by applicable Ohio law as follows:

Fair consideration is given for property, or obligation:

(A) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

(B) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

*Cardiovascular & Thoracic Surgery,* 524 N.E.2d at 917–918 (quoting former Ohio Revised Code § 1336.03).

The bankruptcy court determined that Valley–Vulcan received fair consideration for the $9 million payment to Vulcan, that there was no evidence in the record upon which to conclude that Vulcan did not receive fair consideration for transferring the $9 million to Ampco, and that Valley–Vulcan received fair consideration in granting Ampco a lien on Valley–Vulcan's assets in exchange for Ampco's guaranty of the Trenton IDB. *Valley–Vulcan,* slip op. at 12, 15–16, 19. Each of the bankruptcy court's determinations are amply supported by the record on appeal.

The court's conclusion that the overall value of Vulcan's assets and business justified the $9 million payment to equalize the partners' individual contributions to the Valley–Vulcan partnership is fully supported by the record, which includes the expert testimony of Jeffrey R. Greene, who testified that Vulcan's assets and business had a going concern value of between $16.2 and $27.9 million at the time Valley–Vulcan was formed, excluding liabilities, and the fact that the Underwood Group had recently offered $10.83 million for Vulcan, which is $1.83 million more than the $9 million equalization payment. While the Committee argues that Mr. Greene's valuations were incorrect because they failed to reflect the particular assets' "fair salable value," the Committee does not otherwise dispute that Mr. Greene's opinion at trial was accurately referenced by the bankruptcy court. Moreover, the Committee failed to offer any expert testimony to rebut Mr. Greene's opinions.

The court also correctly observed that the record did not support any conclusion other than that the subsequent transfer of the $9 million from Vulcan to Ampco was on account of legitimate intercompany debt and dividend, and the Committee does not direct the Panel's attention to anything in the record tending to establish otherwise. Finally, the court's conclusion that Valley–

Vulcan received fair consideration for granting Ampco the security interest also is not clearly erroneous, as the record establishes the value of the security interest is limited to the amount Ampco was required to pay under its guaranty of the Trenton IDB in the event of Valley–Vulcan's default. Accordingly, the bankruptcy court's factual findings are not clearly erroneous.

## B. Alter Ego Liability

 The Committee argues that the bankruptcy court erred in determining the controlling rule of law on the issue of whether Ampco could be held liable for Vulcan's liabilities under Ohio's alter ego doctrine. The bankruptcy court applied a 1993 opinion of the Supreme Court of Ohio, while the Committee argues the appropriate standard was set forth in a 1981 decision of the Sixth Circuit.

In 1981, the Sixth Circuit decided *Bucyrus–Erie Company v. General Products Corporation*, which involved a challenge to a jury instruction regarding the application of the alter ego doctrine under Ohio law. 643 F.2d 413 (6th Cir.1981). The Sixth Circuit stated:

> The notion of the corporation as a legal entity is a fiction of the law introduced for convenience in conducting business. Under Ohio law, when "urged to an end subversive of its policy," the fiction should be disregarded and the corporation considered as an aggregation of persons, both in equity and at law....
>
> No precise test for disregarding the corporate fiction has been articulated by the courts, each case being regarded as "sui generis" and decidable on its own facts. Nonetheless, certain general principles have been recognized. As recently set forth in *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), aff'd, 599 F.2d 34 (2nd

Cir.1979), the corporate fiction should be disregarded when: (1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Bucyrus–Erie Co. v. General Prods. Corp.,* 643 F.2d 413, 418 (6th Cir.1981) (internal citations and footnotes omitted).

In 1993, the Supreme Court of Ohio decided *Belvedere Condominium Unit Owners' Association v. R.E. Roark Companies*, in which the court articulated the standard for applying the alter ego doctrine under Ohio law. 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993). The *Belvedere* court discussed *Bucyrus–Erie* in great detail, and ultimately adopted *Bucyrus–Erie's* essential formulation of the alter ego doctrine. 617 N.E.2d at 1086. The *Belvedere* court held:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condominium Unit Owners' Assoc. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), paragraph three of the syllabus.[2]

However, the *Bucyrus–Erie* and *Belvedere* formulations differ in one respect.

---

**2.** The syllabus set forth by the Supreme Court of Ohio authoritatively states the determinative law of the opinion. *See Simon v. Chase*

*Manhattan Bank (In re Zaptocky),* 232 B.R. 76, 82 n. 1 (6th Cir. BAP 1999).

Whereas *Bucyrus–Erie* would permit application of the doctrine where the dominating entity's control over the alter ego "was used to commit fraud or wrong or other dishonest or unjust act," *Belvedere* applies the doctrine only where control of the alter ego was used "to commit fraud or an illegal act." The bankruptcy court read *Belvedere* as setting forth a stricter standard than *Bucyrus–Erie* and required the Committee to prove that Ampco used its alleged domination of Vulcan "to commit fraud or an illegal act." Disagreeing with the precedential effect of *Belvedere*, the Committee asserts on appeal that the appropriate standard is that set forth in *Bucyrus–Erie*, under which proof of any "wrong or other dishonest or unjust act" is sufficient.

■ "When and how state law applies to a particular case is a matter on which the state supreme court has the last word." *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir.1995). It is only when the law of the state is unsettled that federal courts must anticipate how the state's supreme court would rule on an issue of state law. *C & H Entertainment, Inc. v. Jefferson County Fiscal Court*, 169 F.3d 1023, 1025 (6th Cir.1999); *Demczyk v. Mutual Life Ins. Co. (In re Graham Square, Inc.)*, 126 F.3d 823, 827 (6th Cir.1997). In making such determinations of state law, the federal court is thus bound even by the decisions of the state's intermediate courts unless the federal court is convinced the state supreme court would decide the issue differently. *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 789 (6th Cir.1997).

When faced with the issue of how to apply the alter ego doctrine under Ohio law in 1981, the Sixth Circuit anticipated how the Supreme Court of Ohio would determine the issue. However, upon the Supreme Court of Ohio's *Belvedere* decision nearly twelve years later, *Belvedere* became the controlling standard in 1993. The Supreme Court of Ohio has not since revisited the alter ego issue, and *Belvedere*

continues to be the determinative standard applied by Ohio courts. *See, e.g., AT & T Global Info. Solutions v. Union Tank Car Co.*, 29 F.Supp.2d 857, 866 (S.D. Ohio 1998); *Collum v. Perlman*, No. L–98–1291, 1999 WL 252725 at *3 (Ohio Ct.App. Apr. 30, 1999); *Law–Bren, Inc. v. New Horizon Builders, Inc.*, No. CA98–07–052, 1999 WL 126070 at *2 (Ohio Ct.App. Feb. 22, 1999); *State v. Fisher Acquisition & Dev. Corp.*, No. L–97–1411, 1998 WL 421632 at *3 (Ohio Ct.App. July 24, 1998). Thus, the bankruptcy court did not err in applying *Belvedere* as the controlling standard of the application of the alter ego doctrine under Ohio law.

■ Further, to the extent the Committee's argument could be interpreted as challenging the bankruptcy court's application of the *Belvedere* standard, the court's factual findings pertaining to the Committee's alter ego claim are not clearly erroneous. Even in light of precedent holding that injustice short of illegality is sufficient to satisfy *Belvedere*, *see, e.g., AT & T Global*, 29 F.Supp.2d at 868, the Committee points to nothing unjust or improper other than transfers which it has already failed to prove were fraudulent. Accordingly, the bankruptcy court's determination that the Committee failed to prove a cause of action under the alter ego doctrine is not clearly erroneous.

### C. Equitable Subordination

■ The Committee also argues on appeal the bankruptcy court erred in refusing to equitably subordinate Ampco's claims to those of unsecured creditors. To equitably subordinate claims pursuant to 11 U.S.C. § 510(c), the following must be shown:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 224 B.R. 27, 34 (6th Cir. BAP 1998) (citations omitted). *See also Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.),* 163 F.3d 570, 583 (9th Cir.1998) (same). The *Structurlite* Panel further stated that creditor misconduct is not a necessary prerequisite to equitable subordination and recognized the application of "no fault" subordination, which turns on the nature and origin of the claims involved. *Structurlite,* 224 B.R. at 35.

The Committee urges two factors in support of its request for the equitable subordination of Ampco's claims to those of unsecured creditors. First, the Committee alleges Ampco both undercapitalized and stripped away the assets of Valley–Vulcan in the course of the formation of the partnership. Second, the Committee points out that liability on the Trenton IDB was originally an unsecured obligation of Vulcan, but became a secured obligation of Valley–Vulcan via Ampco's retention of a security interest equal to the amount, if any, that Ampco was required to pay on the Trenton IDB in the event of Valley–Vulcan's default.

In holding the Committee was not entitled to equitable subordination, the bankruptcy court again noted the Committee's failure to prove any facts warranting the relief sought. The court pointed out there was nothing in the evidence introduced at trial to support the Committee's allegations of undercapitalization or asset-stripping and that the Committee had already failed in its attempts to rove that any transfer at issue was fraudulent under Ohio law. *Valley–Vulcan,* slip op. at 28–29. The court specifically credited testimony at trial adequately explaining each transfer at issue. *Id.*

With respect to its argument based on the status of the Trenton IDB, the Committee fails to distinguish the nature of the formation of the partnership and the respective obligations of the parties. The record is consistent that Mellon Bank's consent was necessary in order to transfer the assets of Vulcan and Vulcan's liability on the IDB to Valley–Vulcan, that Ampco's guarantee was necessary to obtain Mellon Bank's consent, and that Ampco, which had no former liability on the IDB, simply secured its new liability under the guarantee by retaining a security interest equal to any amounts it was required to pay if Valley–Vulcan defaulted. The Committee has not drawn the Panel's attention to anything which would establish that the bankruptcy court's conclusions are unsupported by the record. Accordingly, the bankruptcy court did not abuse its discretion in denying the Committee's request for equitable subordination of Ampco's claims. *See, e.g., Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.),* 163 F.3d 570, 583 (9th Cir.1998) (stating " 'subordination requires some showing of suspicious, inequitable conduct' " even beyond initial undercapitalization of an enterprise).

## D. Liability under the Joint Venture Agreement

The Committee argues the bankruptcy court erred in holding the Joint Venture Agreement did not impose direct liability on Ampco for the debts of Vulcan or Valley–Vulcan. The bankruptcy court found "nothing in the record to support [the Committee]'s argument that the joint venture agreement was anything more than a list of requirements the four parties must satisfy before Valley and Vulcan could form a partnership," and that "[n]owhere does the agreement state that Ampco (or Microdot for that matter) would be bound in any form of joint venture or partnership." *Valley–Vulcan,* slip op. at 23.

In its brief on appeal, the Committee cursorily states, without elaboration or citation to the Joint Venture Agreement itself, that the Agreement has the effect of making Ampco a joint venturer in the Val-

ley–Vulcan partnership, and thus fully liable for the obligations of Valley–Vulcan under various Ohio and Pennsylvania authorities. However, our detailed review of the 60–page Joint Venture Agreement and its annexes and exhibits reveals nothing at odds with the bankruptcy court's interpretation that the Agreement merely set forth a list of preconditions and otherwise consented to the formation of a partnership between Valley and Vulcan, but did not in any way impose direct liability upon Ampco for any obligations of the partnership or either partner. Accordingly, the bankruptcy court did not err in determining Ampco had no independent liability under the Joint Venture Agreement.

## E. Admission of Expert Testimony

 The Committee objected to the admission of Mr. Greene's testimony as an expert witness, and argues on appeal that the bankruptcy court erred in admitting such testimony. Specifically, the Committee asserts Mr. Greene was not an expert qualified to give "solvency opinions" and that this area of analysis is not widely accepted in the appropriate professional venues. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED.R.EVID. 702.

Pursuant to Rule 702, " 'the trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable.' " *General Elec. Co. v. Joiner,* 522 U.S. 136, ——, 118 S.Ct. 512, 516, 139 L.Ed.2d 508 (1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993)). In making this determination, the trial judge should look to the reasoning or methodolo-

gy employed by the expert, whether the reasoning or methodology has been tested or subjected to peer review, the known rate of error if one can be determined, and may also consider whether the reasoning or methodology has been generally accepted within the relevant professional community. *Daubert,* 509 U.S. at 593–595, 113 S.Ct. 2786. The Court also was careful to emphasize, "The inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594, 113 S.Ct. 2786. The Supreme Court later made clear that the Daubert standard applies to all determinations of admissibility of expert testimony pursuant to Rule 702. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). The Court in *Kumho* also emphasized that *Daubert's* "list of factors was meat to be helpful, not definitive," and that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho,* 119 S.Ct. at 1175–76. A trial judge is thus granted broad discretion to determine the admissibility of expert testimony. *Kumho,* 119 S.Ct. at 1176; *Joiner,* 118 S.Ct. at 517.

At trial, Mr. Greene testified that he had obtained undergraduate and graduate degrees from prestigious universities, that he had subsequently been employed with various financial firms, that as of the time of trial he was a partner and national director of a valuation services group with a leading financial firm, and that at a previous firm, he had essentially developed solvency opinions as a financial product line. The bankruptcy court overruled the Committee's objection to the appropriateness of solvency opinions as a field of inquiry, noting that the opinion of a person experienced in evaluating the solvency of a business would assist the court in the determination of facts at issue in the proceeding.

In light of Mr. Greene's experience in determining the solvency of companies in complex financial circumstances and the nature of the factual issues regarding the

effect of the transfers challenged by the Committee, Mr. Greene's testimony easily satisfies the flexible standard for admissibility enunciated in *Daubert* and *Kumho.* Accordingly, the bankruptcy court did not abuse its discretion in admitting Mr. Greene's testimony pursuant to Rule 702. *See, e.g., Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir. 1998) (" 'Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact.' ").

## F. Motion for Additional Discovery

At a pretrial conference held May 4, 1993, the bankruptcy court set August 16, 1993 as the discovery cut-off date and October 4, 1993 as the trial date. The Committee subsequently moved several times for an extension of the discovery deadline and postponement of the trial date. On August 25, 1993, the bankruptcy court denied the Committee's request for additional discovery and postponement of trial, noting that the Committee had full knowledge of the timetables set by the court and had even received authorization to hire additional counsel to assist in preparing for trial. The court also noted that the Committee itself had failed to act promptly on certain matters after assuring the court it would do so, and that the Committee had filed "sundry motions to delay this adversary proceeding." On September 21, 1993, the bankruptcy court further denied the Committee's motion to reconsider the court's August 25, 1993 order. The court again noted that in an adversary proceeding which was already more than two years old, the sole cause of any difficulty in which the Committee found itself on the eve of trial was the Committee's own lack of diligence in the pursuit of discovery and other pretrial matters. Finally, on the opening day of the trial, the Committee again moved for additional discovery and delay of trial, and was again refused by the bankruptcy court. The court simply repeated on the record that the Committee had failed to take advantage of ample opportunity for discovery.

" 'The scope of discovery is, of course, within the broad discretion of the trial court.... An order denying further discovery will be grounds for reversal only if it was an abuse of discretion resulting in substantial prejudice.' " *Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir. 1998) (citation omitted) (alteration in original). *See also Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.),* 163 F.3d 570, 584 (9th Cir.1998) ("A lower court's decision not to permit further discovery is reviewed for an abuse of discretion."); *Good v. Ohio Edison Co.,* 149 F.3d 413, 422 (6th Cir.1998) (trial court's order denying additional discovery is reviewed for abuse of discretion); *Mulvania v. United States (In re Mulvania),* 214 B.R. 1, 6 (9th Cir. BAP 1997) (" '[A bankruptcy court] has wide latitude in controlling discovery, and its ruling will not be overturned in the absence of a clear abuse of discretion.' " (citations omitted) (alteration in original)); *Keybank Nat'l Assoc. v. Mann (In re Mann),* 220 B.R. 351, 355 (Bankr.N.D.Ohio 1998) ("In the face of discovery disputes, the decision as to the manner and timing in which discovery should proceed is left to the sound discretion of the trial court."). Courts are particularly skeptical of requests for additional discovery where the moving party has already been accorded ample time and opportunity for discovery. *See, e.g., Tate v. Boeing Helicopters,* 140 F.3d 654, 661 (6th Cir.1998) (denial of motion for additional discovery was not an abuse of discretion where the litigant had already been given adequate opportunity for discovery).

The record on appeal fully supports the bankruptcy court's statements that the Committee had been afforded adequate time for discovery and that the Committee itself was responsible for its failure to obtain whatever discovery it felt necessary to appropriately prepare for trial. Accordingly, the bankruptcy court did not abuse

its discretion in denying the Committee's motions for additional discovery and postponement of trial.

## G. Disqualification of Counsel

On September 28, 1993, six days prior to the beginning of the trial, the Committee moved to disqualify Ampco's counsel on the grounds of conflict of interest, alleging that Ampco's counsel had acted as counsel for the Debtor, Vulcan, and Ampco in connection with the Joint Venture Agreement and the partnership agreement, that Ampco's counsel was involved with the drafting of the partnership resolution authorizing Valley–Vulcan's bankruptcy filing, and that certain attorneys employed by Ampco's counsel could be called as witnesses. The bankruptcy court denied the Committee's motion for disqualification in an oral ruling on the first day of trial.

 "Motions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993) (citations omitted). "[T]he party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified," because "[a]lthough a party has no right to specific counsel, 'a party's choice of counsel is entitled to substantial deference.'" *Id.* (citations omitted). The Sixth Circuit has articulated the following test for determining whether disqualification based on a conflict of interest is warranted:

A three-part test for disqualification exists: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification.

*Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882, 889 (6th Cir.1990) (citations omitted).

 Although the factors listed in the Committee's motion raise, but do not establish, the possibility of a potential conflict of interest, a more significant issue in reviewing the bankruptcy court's denial of the Committee's motion is whether the Committee should be permitted to raise the issue less than a week before trial. As essential as it is to the integrity of the bankruptcy process that counsel be free of conflicts of interest, courts have disallowed disqualification on the basis of waiver or estoppel where the moving party has failed to move for disqualification in a timely manner. "It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983). As stated by the *Primerica* court:

Waiver is a valid basis for the denial of a motion to disqualify....

[A] finding [of waiver] is justified ... when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity. In [this] circumstance, the person whose confidences and secrets are at risk of disclosure or misuse is held to have waived his right to protection from that risk.

In determining whether the moving party has waived its right to object to the opposing party's counsel, consideration must be given to (1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party. In

particular, consideration should be given and inquiry made as to whether the motion was delayed for tactical reasons. *Primerica,* 822 F.Supp. at 1115 (internal citations and footnotes omitted).

It appears from the record that the Committee should have been aware of the participation of Ampco's counsel in the various transactions between the parties sometime in January 1991 when the Committee first received discovery relating to the formation of Valley–Vulcan. However, the Committee first raised the issue of a potential conflict of interest with Ampco's counsel by letter dated August 17, 1993, one day following the bankruptcy court's August 16th discovery deadline, and the Committee failed to move for disqualification until September 28, 1993, only six days before trial and seven days after the bankruptcy court had refused to reconsider its order denying the Committee's motion for additional discovery.

"Our standard of review of a [bankruptcy] court's decision regarding disqualification of counsel is a generous one. The [bankruptcy] court is to be given wide latitude." *United States v. Mays,* 69 F.3d 116, 121 (6th Cir.1995). *See also Trust Corp.,* 701 F.2d at 87 ("An order disqualifying counsel or refusing to disqualify counsel will not be disturbed if the record reveals any sound basis for the [bankruptcy] court's action."). The tactical considerations of the Committee's failure to move for disqualification of Ampco's counsel in a timely manner in this case are clear, as is the prejudice that would result to Ampco if its counsel, who was known to the Committee prior to the filing of the adversary and throughout the multi-year pretrial proceedings, should be disqualified less than a week before trial. Accordingly, the bankruptcy court did not err in denying the Committee's motion to disqualify Ampco's counsel. *See, e.g., Trust Corp.,* 701 F.2d at 88 (motion for disqualification denied where it was asserted "just prior to the scheduled trial date"); *Chemical Waste Management, Inc. v. Sims,* 875

F.Supp. 501, 505 (N.D.Ill.1995) (motion for disqualification made 21 months after movant became aware of possible grounds for disqualification denied); *Primerica,* 822 F.Supp. at 1116 (motion to disqualify denied when made only four months prior to trial in litigation that had already spanned over three years); *Warpar Mfg. Corp. v. Ashland Oil, Inc.,* 606 F.Supp. 852, 858–859 (N.D.Ohio 1984) (motion made nearly two years after discovery of potential grounds for disqualification was denied because of substantial prejudice to the opposing party).

## V. CONCLUSION

The bankruptcy court's judgment is **AFFIRMED**.